# THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TERRY TAYLOR, et al., | ) |
| Plaintiffs, | ) Case No. 16-cv-8159 |
| v. | ) Judge Robert M. Dow, Jr. |
| MARK RODRIGUEZ, and CITY OF CHICAGO, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' motion for summary judgment [42]. For the reasons set forth below, the motion [42] is granted in part and denied in part. The case is set for further status on October 11, 2018 at 9:00 a.m.

### I. Background

This case arises from the shooting of Plaintiffs' family dog—an approximately 110-pound Italian Mastiff Cane Corso named Castro. [44 (Defs.' Stmt. of Facts), at ¶¶ 49-50.] On the morning of August 18, 2014, Officer Mark Rodriguez was assigned to the 2nd District of the Chicago Police Department. [*Id*. at ¶ 7.] At approximately 7:30 a.m. on that date, Officer Rodriguez was driving in his assigned marked police vehicle near 536 East Best Drive in Chicago, Illinois. [*Id*. at ¶ 8.] He was in full uniform and was not working with a partner. [*Id*. at ¶ 9.] Officer Rodriguez was flagged down by an individual who told him he had just been robbed by an offender with a gun. [*Id*. at ¶¶ 10-11.] The victim identified a man riding away on a bicycle as the armed robber. [*Id*. at ¶ 12.] Officer Rodriguez, still in his police vehicle, initiated a chase after

the offender. [*Id.* at ¶ 13.] The offender went west on Best Drive and then north on Martin Luther King Jr. Drive. [*Id.* at ¶ 14.] This is where the parties' accounts of the relevant events diverge.

Officer Rodriguez testified that as he got close to the offender, the offender jumped off of his bicycle, climbed over a chain-link fence, and ran into a yard at Plaintiffs' residence. [*Id.* at ¶ 15.] According to Officer Rodriguez, the offender was in Officer Rodriguez's full sight until he ran into the yard. [*Id.* at ¶ 16.] Officer Rodriguez quickly parked his police vehicle and followed the offender into the yard. [*Id.* at ¶ 17.] While in the yard on the side of the property, a huge dog aggressively charged at Officer Rodriguez. [*Id.* at ¶ 19.] The dog was loudly growling, barking, bearing his teeth and lunging at Officer Rodriguez. [*Id.* at ¶ 20.] The dog attempted to bite Officer Rodriguez several times. [*Id.* at ¶ 22.] In response, Officer Rodriguez hit the dog with the butt of his gun. [*Id.* at ¶ 23.] The dog shook the hit off, retreated a little, and then again aggressively charged at Officer Rodriguez. [*Id.* at ¶ 24.] Officer Rodriguez then shot the dog because he feared for his life. [*Id.* at ¶¶ 26-27.] Officer Rodriguez testified that after he shot Plaintiffs' dog, he walked to the front of the house where he saw someone come outside. [44-7 (Rodriguez Dep. Tr.), at 23:9-22.] He told the person to get back in the house because he did not know where the robbery suspect was. [*Id.* at 24:7-11.] Officer Rodriguez testified that he then went to look for the robbery suspect, who he still viewed as a threat. [*Id.* at 24:18-21.]

Plaintiffs have not identified any eyewitness to the actual shooting besides Officer Rodriguez. No Plaintiffs witnessed the actual shooting of their dog. [44 (Defs.' Stmt. of Facts), at ¶ 30-33.] At the time, Plaintiff Terry Taylor was in his bedroom—which is on the second floor in the front of the house—looking out the window. [*Id.* at ¶¶ 34-35.] The side of the house (where the shooting occurred) is not visible from his room. Plaintiffs Atara Taylor, Zion Taylor and

2

Sarafina Taylor were in the same bedroom with Plaintiff Terry Taylor. [*Id*. at ¶ 34.] Plaintiffs Zion Taylor and Sarafina Taylor were sleeping when the shooting occurred. [*Id*. at ¶¶ 37-38.]

Still, Plaintiffs dispute Officer Rodriguez's account of the events. To begin, Plaintiffs contest that Officer Rodriguez saw the offender jump the fence and run into the yard surrounding Plaintiffs' residence. Plaintiffs also dispute that Officer Rodriguez was in pursuit of the offender at the time he shot their dog. Plaintiffs dispute these contentions on the grounds that nobody heard the offender run through their yard and that nobody saw the offender after the shooting. [53 (Pls.'s Resp. to Defs.' Stmt. of Facts), at ¶ 15.] Furthermore, Plaintiff Terry Taylor testified that after he heard tires screeching, he looked out the window and saw Officer Rodriguez walking—not running—to the backyard just before he shot the dog. [44-3 (T. Taylor Dep. Tr.), at 30:20-24.] According to Plaintiffs, this undermines Officer Rodriguez's testimony that he was in pursuit of a suspect when he encountered Plaintiffs' dog. Officer Rodriguez admits that he was not running after the suspect; he characterized his speed as a "[s]light jog" or a "brisk walk." [44-7 (Rodriguez Dep. Tr.), at 14:22-15:4.]

Plaintiffs also dispute that Castro aggressively charged at Officer Rodriguez and that Officer Rodriguez feared for his life. Prior to the shooting, neither Terry Taylor nor Aaron Thompson heard any barking, commotion, or yelling before the shooting, except for the sound of screeching tires. [53 (Pls.'s Resp. to Defs.' Stmt. of Facts), at ¶¶ 19-20.] Furthermore, Plaintiffs cite to evidence indicating that Officer Rodriguez shot Plaintiffs' dog when the dog was on the other side of a latched, chain-link fence. [*Id*.] Aaron Thompson—who lived in the basement of Plaintiffs' building—testified that he was woken up by gunshots on the day in question. [44-8 (Thompson Dep. Tr.), at 13:12-16.] Mr. Thompson immediately went outside to see what happened. [*Id*. at 57:23-58:8.] Mr. Thompson's bedroom was next to the front door of his unit.

3

[*Id*.] When Mr. Thompson opened the door, he saw Officer Rodriguez on the outside of the latched gate[1] and Plaintiffs' dog 15-20 feet away from Officer Rodriguez on the other side of the gate. [*Id*. at 52:9-54:19.] Officer Rodriguez pointed his gun at Mr. Thompson and told Mr. Thompson to go inside. [*Id*. at 49:24-50:15, 54:20-23.] Mr. Thompson said "no" and yelled for Terry Taylor (Plaintiff, and the dog's owner) to come outside. [*Id*. at 54:20-56:13.] Terry Taylor testified that when he initially asked Officer Rodriguez why he shot his dog, Officer Rodriguez told him that the perpetrator shot the dog. [44-3 (T. Taylor Dep. Tr.), at 31:5-14.]

Plaintiffs further contend that their dog would not have aggressively charged at Officer Rodriguez because it was not in the dog's nature to be aggressive. Terry Taylor described the dog as a "cuddly, goofy dog." [44-3 (T. Taylor Dep. Tr.), at 57:1-2.] Mr. Taylor testified that the dog was "friendly" and really lovable. [*Id*. at 57:5-7, 92:14-20.] Neighbors would approach the dog to pet it and kids would ride the dog like a horse. [*Id*. at 64:4, 92:14-20.] Plaintiffs' family even would throw birthday parties for their dog. [*Id*. at 57:16-21.] Plaintiffs could take the dog for walks without a leash because it was "so mild mannered" and trained to follow hand commands. [*Id*. at 92:14-93:1.] Other than Officer Rodriguez's testimony in this case, there is no evidence that Castro ever was aggressive toward anyone—family members, neighbors, or even strangers.

After Plaintiffs' dog was killed, the dog was taken to Dr. Sophia Gill—a veterinarian at the Bronzeville Animal Clinic—who conducted a necropsy on Plaintiffs' dog. [54 (Pls.' Stmt. of Add'l Fact), at ¶ 1.] The report indicated that the dog had been shot in the chest and the head. [62-1 (Defs.'s Ex. K), at 5.]. The report also indicated that there were two large exit wounds on the ventral neck and over the left shoulder. [*Id*. at 4.] Based on the location of the entry and exit wounds, Dr. Gill testified that the gunshots came from behind the dog. [54-1 (Gill Dep. Tr.), at

---

[1] Officer Rodriguez's testimony indicates that the property had a chain link fence with a fork latch (a u-shaped latch that fits over a fence post). [44-7 (Rodriguez Dep. Tr.), at 16:11-17:2.]

29:13-24.] When counsel asked her about her prior representation that the dog was shot in the head and the chest, Dr. Gill explained that bullets remained in the dogs' head and chest. [54-1 (Gill Dep. Tr.), at 30:18-31:22.]

On August 17, 2016, Plaintiffs Terry Taylor, Atara Taylor, and their children Safrina Taylor and Zion Taylor filed a lawsuit against Officer Rodriguez under § 1983, alleging that Officer Rodriguez violated their Fourth and Fourteenth Amendment rights. [See 1.] Plaintiffs also brought an indemnification claim against the City of Chicago. [*Id.*]. Pending before the Court is Defendants' motion for summary judgment. [See 42.]

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion

by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250. A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp.*, 477 U.S. at 323. In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III. Analysis

Plaintiffs bring a number of constitutional claims against Officer Rodriguez pursuant to § 1983. To survive summary judgment on a claim brought under § 1983, the Court "focuses on '(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured

6

by the Constitution or laws of the United States.'" *Armato v. Grounds*, 766 F.3d 713, 719-20 (7th Cir. 2014) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). The parties do not dispute that Officer Rodriguez was acting under color of state law for the purposes of this motion. The question before the Court therefore is whether a reasonable jury could conclude that Officer Rodriguez's conduct deprived Plaintiffs' of rights, privileges, or immunities secured by the Constitution or laws of the United States.

A.      **Fourth Amendment Seizure**

Plaintiffs bring a Fourth Amendment claim under § 1983, alleging that Officer Rodriguez violated their Fourth Amendment rights by unjustifiably shooting their dog. "[T]he Fourth and Fourteenth Amendments provide a remedy when a citizen's property is unreasonably damaged during a search." *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998))). Because "domestic animals are 'effects' within the meaning of the Fourth Amendment[,]" the "unnecessary killing of a person's pet offends the Fourth Amendment." *Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008) (citing *Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir. 2001)). "[T]he use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Id.* (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210-11 (3d Cir. 2001)).

Viewing the evidence in the light most favorable to Plaintiffs, it was unreasonable for Officer Rodriguez to believe that Plaintiffs' dog posed an immediate danger or that the use of force on the dog was unavoidable. To begin, Plaintiffs have introduced evidence indicating that Officer Rodriguez shot Plaintiffs' dog when the dog was on the other side of a closed, chain-link fence.

7

According to Mr. Thompson, after he opened his door immediately after hearing gunshots, he saw Officer Rodriguez on the outside of the latched gate and Plaintiffs' dog 15-20 feet away from Officer Rodriguez on the other side of the gate. [44-8 (Thompson Dep. Tr.), at 52:9-54:19.] Officer Rodriguez pointed his gun at Mr. Thompson and told Mr. Thompson to go inside. [*Id*. at 49:24-50:15, 54:20-23.] Mr. Thompson said "no" and yelled for Terry Taylor (the dog's owner) to come outside. [*Id*. at 54:20-56:13.] Although it is not clear from the record how long it took Mr. Thompson to get to his door, Mr. Thompson testified that he knew where Officer Rodriguez was when he shot the dog because of his proximity to the door and the speed at which he went to the door after the shooting. [*Id*. at 57:23-59:17.]

Furthermore, although Officer Rodriguez testified that he walked toward the front of the house after he shot Plaintiffs' dog—which might explain his location when Mr. Thompson saw him—it is unclear why he would do so if he believed that an armed suspect might still be in the backyard. Indeed, Officer Rodriguez testified that after he spoke to Mr. Thompson, he went to look for the robbery offender, who he still believed was a threat. [44-7 (Rodriguez Dep. Tr.), at 24:18-21.] Furthermore, Terry Taylor testified that when he initially asked Officer Rodriguez why he shot his dog, Officer Rodriguez told him that the perpetrator shot the dog. [44-3 (T. Taylor Dep. Tr.), at 31:5-14.] If credited by the trier of fact, that testimony would call into question Officer Rodriguez's account of the dog shooting. Although neither Mr. Thompson nor Terry Taylor witnessed the actual shooting, their testimony calls into question Officer Rodriguez's account of the events and creates an issue of fact regarding Officer Rodriguez's location relative to Plaintiffs' dog at the time of the shooting.

Finally, Plaintiffs have offered the testimony of Dr. Gill, who testified that the location of the entry wounds and exit wounds on Plaintiffs' dog indicated that Plaintiffs' dog was shot from

behind.² The report indicated that the dog had been shot in the chest and the head. [62-1 (Defs.'s Ex. K), at 5.]. The report also indicated that there were two large exit wounds on the ventral neck and over the left shoulder. [*Id*. at 4.] Dr. Gill testified that the entry wounds were on the back of the dog, indicating that the bullets came from behind the dog. [54-1 (Gill Dep. Tr.), at 29:13-24.] Defendants argue that this testimony should be disregarded because it contradicts the necropsy report. [62 (Defs.' Resp. to Pls.' Stmt. of Add'l Facts), at ¶ 2.] But Dr. Gill explained at her deposition that she noted that Plaintiffs' dog was shot in the head and in the chest because x-rays of the dog indicated that bullets remained in the dogs' head and chest.³ [54-1 (Gill Dep. Tr.), at 30:18-31:22.] Defendants also argue that Dr. Gill's testimony should be disregarded because she's a friend of Plaintiffs' friend. [61, at 6.] While Dr. Gill's relationship to Plaintiffs is relevant to her credibility, the Court does not make credibility determinations on summary judgment. *Washington*, 481 F.3d at 550. Accordingly, the Court will not disregard Dr. Gill's testimony on that basis. In sum, Dr. Gill's testimony, if credited, casts doubt on Officer Rodriguez's claim that he shot Plaintiffs' dog when he was charging at him. Viewing all the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Officer Rodriguez acted unreasonably by killing Plaintiffs' dog.

---

² Defendants have not objected to Dr. Gill's testimony as improper lay or expert opinion testimony. The Court therefore has not considered whether Dr. Gill's testimony satisfies the evidentiary standards for admitting such testimony.

³ Even if Dr. Gill's testimony contradicted her written report, that would not mean that her testimony would be inadmissible. Although the Seventh Circuit has long held that "that parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions[,]" *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) (citations omitted), this does not mean that a witness's sworn testimony is inadmissible on summary judgment whenever it contradicts or is in tension with prior statements. Such inconsistencies may go to a witness's credibility, but the Court does not make credibility determinations on motions for summary judgment. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).

Defendants argue that—even assuming that Officer Rodriguez did not act reasonably when he shot Plaintiffs' dog—Officer Rodriguez is entitled to qualified immunity on Plaintiffs' Fourth Amendment seizure claim. In making this argument, Defendants essentially re-raise the same factual arguments they make in support of their contention that Officer Rodriguez did not act unreasonably by killing Plaintiffs' dog. In determining whether a defendant is entitled to qualified immunity at the summary judgment stage, however, courts "accept the plaintiff's version of the facts, without vouching for their ultimate accuracy." *Weinmann v. McClone*, 787 F.3d 444, 446 (7th Cir. 2015) (citing *Jewett v. Anders,* 521 F.3d 818, 819 (7th Cir. 2008)). Accepting Plaintiffs' version of the facts, Officer Rodriguez killed Plaintiffs' dog when it was on the other side of a closed, chain-link fence. At the time of the shooting, it was clearly established that "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Viilo v. Eyre*, 547 F.3d 707, 711 (7th Cir. 2008) (citing *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210-11 (3d Cir. 2001)). Officer Rodriguez therefore is not entitled to qualified immunity on Plaintiffs' Fourth Amendment seizure claim. Accordingly, Officer Rodriguez's motion for summary judgment on Plaintiffs' Fourth Amendment seizure claim (Count I) is denied.

### B. Fourth Amendment Search

Plaintiffs bring a Fourth Amendment search claim under § 1983, alleging that Officer Rodriguez violated their Fourth Amendment rights by entering their property without a warrant. Defendants argue that Plaintiffs Fourth Amendment claim fails because (1) Plaintiffs did not have a reasonable expectation of privacy in the yard of a multi-unit building, and (2) exigent

circumstances existed that justified the warrantless search of their home. The Court addresses each of these arguments in turn.

> i. *Reasonable Expectation of Privacy*

Defendants argue that Plaintiffs' Fourth Amendment search claim fails because Plaintiffs could not have had a reasonable expectation of privacy in the yard of a multi-unit building that housed non-family members. In making this argument, Plaintiffs cite to cases holding that persons cannot have a reasonable expectation of privacy in common areas of a multi-family unit. See, *e.g.*, *United States v. Villegas,* 495 F.3d 761, 767-68 (7th Cir. 2007) (holding that there is no reasonable expectation of privacy in common hallway of duplex). The parties dispute whether the yard was such a common area. Plaintiffs deny that their residence was a multi-unit building with multiple tenants, but they do admit that a non-relative (Aaron Thompson) rented the basement apartment. [53 (Pls.'s Resp. to Defs.' Stmt. of Facts), at ¶ 28.] Plaintiffs also dispute that the yard was used by all tenants. However, neither party has pointed to testimony or evidence establishing whether Mr. Thompson or other non-family members had access to the yard. Plaintiffs bear the burden of persuasion with respect to the elements of their Fourth Amendment claim. *Martinez v. City of Chicago*, 900 F.3d 838, 846 (7th Cir. 2018). But Plaintiffs have not identified sufficient evidence for a reasonable jury to conclude that they had a reasonable expectation of privacy in their yard.

In any event, whether Plaintiffs had a reasonable expectation of privacy is not dispositive of Plaintiffs' Fourth Amendment search claim. "In recent years, the Supreme Court has revived a 'property-based approach' to identify unconstitutional searches." *United States v. Sweeney*, 821 F.3d 893, 899 (7th Cir. 2016) (quoting *United States v. Jones*, 565 U.S. 400, 405 (2012)). "Under this approach, where the government has 'physically occupied private property for the purpose of obtaining information,' its intrusion is a search subject to the Fourth Amendment." *Id*. (quoting

11

*Jones*, 565 U.S. at 404). "To establish a Fourth Amendment violation under this approach, there must be some trespass upon one of the protected properties enumerated by the Constitution's text." *Id*. Although courts have continued to hold that tenants lack any Fourth Amendment interest in common areas of multi-unit properties, these Courts also have recognized that an owner or landlord of a property would have a Fourth Amendment interest in common areas, as the landlord has the legal right to exclude others from his property. *Id*. ("Only the building owner or landlord could bring suit, so only the owner or landlord could have objected to [the officer's] warrantless search of the crawl space under the stairs."). Because Plaintiffs Terry Taylor and Atara Taylor owned the property in question [44-3 (T. Taylor Dep. Tr.), 11:23-12:1], they had a Fourth Amendment interest in the property. Thus, even if the Court were to conclude that the yard was a common area, this would not necessarily defeat Plaintiffs' Fourth Amendment search claim.[4]

    ii.    *Exigent Circumstances*

Defendants argue that even if Officer Rodriquez searched an area subject to Fourth Amendment protection, the search was justified by exigent circumstances. "Warrantless searches of areas entitled to Fourth Amendment protection are presumptively unreasonable, but the government may overcome this presumption by demonstrating that, from the perspective of the officer at the scene, a reasonable officer could believe that exigent circumstances existed and that there was no time to obtain a warrant." *United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012) (citing *United States v. Huddleston,* 593 F.3d 596, 600 (7th Cir. 2010)). The Supreme Court recognizes "hot pursuit" as one of "several exigencies that may justify a warrantless search of a home." *Kentucky v. King*, 563 U.S. 452, 460 (2011). Thus, "[p]olice officers may enter premises

---

[4] No party addresses cases discussing the property-based approach to establishing Fourth Amendment violations. Still, because of this caselaw, Officer Rodriguez cannot show that he is entitled to summary judgment on Plaintiffs' Fourth Amendment search claim based on any lack of a reasonable expectation of privacy alone.

without a warrant when they are in hot pursuit of a fleeing suspect." *Id*. (citing *Santana*, 427 U.S. at 42-43). The Supreme Court describes "hot pursuit" as the "immediate or continuous pursuit of the [suspect] from the scene of a crime." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984); see also 5 Am. Jur. 2d Arrest § 101 ("Hot pursuit describes the situation when the police are pursuing a suspect who is in the process of fleeing from a recently committed crime.").

Plaintiffs do not dispute that Officer Rodriguez was flagged down by an individual who told him that he had just been robbed by an individual with a gun. [44 (Defs.' Stmt. of Facts), at ¶¶ 10-11.] Plaintiffs also do not dispute that Officer Rodriguez then initiated a chase after the offender after the victim identified a man riding away on a bicycle as the armed robber. [44 (Defs.' Stmt. of Facts), at ¶¶ 12-13.] However, Plaintiffs challenge Officer Rodriguez's contention that he saw the offender run into Plaintiffs' yard.

Plaintiffs argue that if the offender ran through their yard, they would have heard the offender. [53 (Pls.'s Resp. to Defs.' Stmt. of Facts), at ¶¶ 15-16.] Plaintiffs' speculation that they would have heard the suspect is not sufficient to discredit Officer Rodriguez's account of events. *Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018) ("Speculation does not defeat summary judgment."). In fact, common sense suggests that a fleeing suspect would try to avoid making noise to avoid detection. Plaintiffs also argue that Officer Rodriguez could not have been in hot pursuit because Officer Rodriguez was walking—not running—towards the backyard. *Id*. Officer Rodriguez may have had a reason for not running into Plaintiffs' yard. For example, Officer Rodriguez may have been cautiously approaching the area given the report of an armed suspect in the vicinity. Plaintiff Terry Taylor also heard screeching tires when Officer Rodriguez pulled up in front of his residence. This further supports Officer Rodriguez's contention that he was actively pursuing an offender he believed to be armed. Finally, Plaintiffs argue that the suspect

could not have run into Plaintiffs' yard because neither Terry Taylor nor Mr. Thompson saw the suspect after the shooting. Officer Rodriguez did not contend that the offender was in sight when he encountered Plaintiffs' dog or at any point after the shooting.

Plaintiffs have not identified any evidence that creates more than a "metaphysical doubt" regarding Officer Rodriguez's claim to have been pursuing an armed suspect, which is insufficient to avoid summary judgment. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) ("Mere 'metaphysical doubt as to the material facts' is not enough." (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Accordingly, the Court grants Officer Rodriguez summary judgment on Plaintiffs' Fourth Amendment search claim (Count II).

### C. Fourteenth Amendment Substantive Due Process

Plaintiffs also bring a Fourteenth Amendment substantive due process claim under § 1983, challenging Officer Rodriguez's act of unlawfully entering and shooting on Plaintiffs' property.[5] Substantive due process is an "amorphous" concept of "very limited" scope. *Tun v. Whitticker,* 398 F.3d 899, 900-02 (7th Cir. 2002). The Supreme Court has identified two categories of substantive due process claims. One category protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience. See *Chavez v. Martinez,* 538 U.S. 760, 787 (2003) (Stevens, J., concurring in part and dissenting in part) ("The Due Process Clause of the Fourteenth Amendment protects individuals

---

[5] Plaintiffs recognize that they cannot bring a substantive due process claim based on Officer Rodriguez's shooting of their dog, as dog-shooting cases framed as Fourteenth Amendment deprivation-of-property claims are more properly pled as Fourth Amendment illegal-seizure claims." *Maglaya v. Kumiga*, 2015 WL 4624884, at *6 (N.D. Ill. Aug. 3, 2015) (citing *Taylor v. City of Chicago,* 2010 WL 4877797, at *4 (N.D. Ill. Nov. 23, 2010); *Kay v. Cnty. of Cook,* 2006 WL 2509721, at *4 (N.D. Ill. Aug. 29, 2006)). "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotations omitted).

against state action that either 'shocks the conscience,' or interferes with [fundamental] rights 'implicit in the concept of ordered liberty'" (citations omitted)). A plaintiff can challenge governmental conduct under both the "fundamental liberty" and the "shocks the conscience" standards of the substantive due process doctrine. See *White v. Rochford,* 592 F.2d 381, 383 (7th Cir. 1979).

With respect to the "fundamental liberty" prong, the first step of the analysis "is to provide a 'careful description' of the interest said to have been violated." *Christensen v. Cty. of Boone, IL*, 483 F.3d 454, 462 (7th Cir. 2007) (quoting *Doe v. City of Lafayette*, 377 F.3d 757, 768 (7th Cir. 2004)). The next step of the analysis is to determine whether the interest is "fundamental"— meaning that it "is so deeply rooted and sacrosanct that no amount of process would justify its deprivation." *Id*. (citing *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). Once the Court is "satisfied that a fundamental right is at stake," the next step is to "determine whether the government has interfered 'directly' and 'substantially' with the plaintiffs' exercise of that right." *Id*. (quoting *Zablocki v. Redhail,* 434 U.S. 374, 386-87 & n. 12 (1978)). Finally, the Court considers "whether the governmental action can find 'reasonable justification in the service of a legitimate governmental objective,' or if instead it more properly is 'characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id*. (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)).

Here, Plaintiffs argue that the interest violated by Officer Rodriguez is their right to be free from arbitrary invasions into their physical and emotional safety. The Seventh Circuit has held that incursions on personal security, including those that "result[ ] in physical and emotional injury to * * * children," are "indisputably breaches of the Due Process Clause." *White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979). But—even viewing the facts in the light most favorable to

15

Plaintiffs—it is questionable how a reasonable jury could find that Officer Rodriguez directly and substantially interfered with that fundamental liberty interest. None of the Plaintiffs witnessed the shooting. And there is no evidence that any Plaintiffs were in physical danger because of the shooting. This case therefore is unlike the only case relied upon by Plaintiffs, in which the government action clearly invaded a party's physical and/or emotional safety. *Cf. Maglaya v. Kumiga*, 2015 WL 4624884, at *1 (N.D. Ill. Aug. 3, 2015) (officer shot puppy eight times while minor child was just feet away). Although Plaintiffs' heard gunshots,[6] Plaintiffs do not provide any facts or arguments indicating that their right to be free from arbitrary invasions into their physical and emotional safety were directly and substantially violated as a result.[7]

It also is questionable whether a reasonable jury could find that Officer Rodriguez's conduct satisfies the "shocks the conscience" prong of their substantive due process claim. "The Supreme Court has held that state action that shocks the conscience is conduct which may be deemed 'arbitrary in the constitutional sense.'" *Jackson v. Indian Prairie Sch. Dist.*, 204, 653 F.3d 647, 654 (7th Cir.2011). (citation omitted); *see also Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir.2007) (substantive due process "affords protection of the individual against arbitrary action of government"). "Only the most egregious official conduct will satisfy this stringent inquiry, such that making a bad decision, or even acting negligently, does not suffice to establish the type of

---

[6] Plaintiffs also argue that their personal security was violated when they saw an armed officer in their yard. However, Plaintiffs have not cited to any evidence indicating that any Plaintiff other than Terry Taylor saw the armed officer. Regardless, Plaintiffs do not cite to any authority supporting the contention that just seeing an armed officer on your property can establish a substantive due process violation.

[7] To be sure, Plaintiffs likely were emotionally affected by the fact that their dog was killed, but that will likely be the case in any dog-shooting case. Without showing something more, such as physical danger to the person of a plaintiff, this fact cannot be sufficient to escape the Fourth Amendment analysis that generally applies to dog-shooting cases.

conscience-shocking behavior that results in a constitutional violation." *Whitted v. Dart*, 2014 WL 2819004, at *6 (N.D. Ill. June 23, 2014) (alterations and quotations omitted).

The Court need not definitively resolve whether Officer Rodriguez's conduct violates the "fundamental liberty" or the "shocks the conscience" standards of the Fourteenth Amendment's substantive due process doctrine, however, as Plaintiffs have not shown "that the law concerning the [their] asserted right was clearly established at the time the challenged conduct occurred." *Koger v. Bryan*, 523 F.3d 789, 802 (7th Cir. 2008) (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006)). "Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate *clearly established* statutory or constitutional rights that a reasonable person would know about." *Mustafa*, 442 F.3d at 548 (emphasis in original) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "A plaintiff seeking to defeat an assertion of qualified immunity must establish 'that the law concerning the plaintiff's asserted right was clearly established at the time the challenged conduct occurred.'" *Koger*, 523 F.3d at 802 (citing *Mustafa*, 442 F.3d at 548). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "This is not to say that an official will always be shielded by immunity unless the challenged practice has previously been deemed unlawful; rather 'in the light of pre-existing law the unlawfulness must be apparent.'" *Koger*, 523 F.3d at 802 (citing *Anderson*, 483 U.S. at 640.

Plaintiffs can show that the law "was clearly established by presenting a closely analogous case that establishes that the [Officer Rodriguez's] conduct was unconstitutional or by presenting evidence that [Officer Rodriguez's] conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v.*

17

*Bender*, 600 F.3d 770, 780 (7th Cir. 2010) (citations omitted). Plaintiffs have not done either. The only case Plaintiffs cite to in support of their substantive due process claim is *Maglaya*, which (as discussed above) involved the shooting of a puppy just feet away from a child. The case therefore is not closely analogous to this case. Plaintiffs appear to argue that the fact that they heard Officer Rodriguez discharge his gun on their property is enough to establish a substantive due process violation. Given that no Plaintiff witnessed the shooting and that no Plaintiff was placed in harm's way as a result of the shooting (beyond the emotional harm that likely would result from any dog-shooting case), Plaintiffs have failed to establish that the law was "sufficiently clear that a reasonable official would understand that" the challenged conduct violated their substantive due process rights. The Court therefore grants Officer Rodriguez summary judgment on Plaintiffs' substantive due process claim (Count III).

### D. Indemnification

Defendant City of Chicago argues that it is entitled to summary judgment on Plaintiffs' indemnification claim because "[a] local public entity is not liable for an injury resulting from an act or omission of its employees where the employee is not liable." [43, at 14 (quoting 745 ILCS 10/2-109).] Because the Court is denying summary judgment on Plaintiffs' Fourth Amendment seizure claim against Officer Rodriguez, Plaintiffs' indemnification claim against the City of Chicago survives. Accordingly, the Court denies summary judgment on Plaintiffs' indemnification claim (Count IV).

## IV. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment [18] is granted in part and denied in part. The case is set for further status on October 11, 2018 at 9:00 a.m.

Dated: September 27, 2018

_____
Robert M. Dow, Jr.
United States District Judge